**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**(MARSHALL DIVISION)**

| | |
|---|---|
| HENRY SEELIGSON, JOHN M. SEELIGSON, SUZANNE SEELIGSON NASH, and SHERRI PILCHER, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>DEVON ENERGY PRODUCTION COMPANY, L.P.,<br><br>*Defendant.* | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL COMPLAINT

1. Plaintiffs Henry Seeligson, John M. Seeligson, Suzanne Seeligson Nash, and Sherri Pilcher (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action, by and through their attorneys, against Defendant Devon Energy Production Company, L.P. ("Devon" or "Defendant"). The following allegations are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on investigation by counsel.

**I.   NATURE OF THE CASE**

2. Plaintiffs bring this class action to recover damages for Devon's unlawful conduct in improperly calculating and intentionally underpaying millions of dollars in royalties owed to Plaintiffs and other lessors for the extraction of oil and gas from Texas wells that was moved, gathered, transported and/or processed through the Bridgeport Gas Processing Plant (the "Plant" or "Bridgeport Plant") from January 1, 2008 through the present ("Class Period").

1

3. As stated herein, throughout the Class Period, Devon breached its express and implied obligations to Plaintiffs and the Class by systematically and intentionally underpaying royalties owed to Plaintiffs and Class members. Devon executed its scheme by, *inter alia*, entering into sham transactions with an affiliate company, Devon Gas Services, LP ("DGS"), through which it assessed unreasonable and artificially inflated fees purportedly related to processing residue gas and natural gas liquids ("NGLs") and then forced the Class to absorb the inflated fees through lower royalty payments. The specific sham transactions that are at issue here involve Devon's sham sales to one or more affiliates, including DGS, purportedly at or near the wellhead and subsequent transportation of gas to DGS' Bridgeport Plant where gas extracted from Plaintiffs' and the Class members' wells was processed. Through these sham transactions, Devon imposed hidden fees on Plaintiffs and Class members that were not related to actual or reasonable costs. In fact, Devon imposed artificially inflated fees as high as ***17.5% of the price of the gas*** flowing through the Bridgeport Plant.

4. These fees were not "cost-of-service" based, but were instead marked-up to provide additional revenue and a profit and/or return on invested capital to DGS, and ultimately the parent corporation of both Devon and DGS, Devon Energy Corporation ("DEC"). Devon paid DGS fees that greatly exceeded DGS's actual costs. Devon, in turn, passed these artificial, inflated and unreasonable fees along to Plaintiffs and the Class members by deducting them from royalty payments. These deductions were inflated, improper, and completely unrelated to the actual cost-of-service and merely served to enrich Devon and its affiliates. These fees were a lucrative profit center for Devon and its affiliates and applied to all Class members regardless of the language in their underlying lease agreements.

5.      In addition to imposing artificial costs and fees, Devon also allowed its affiliate DGS to improperly retain profits from the sale of Plaintiffs' and the Class members' production that was moved, gathered, transported and/or processed through the Bridgeport Plant, without properly accounting for those profits to Plaintiffs or the Class.  Devon's failure to monitor the profits being made by DGS for its sales to third parties and remit proceeds to Plaintiffs and the Class violated Devon's duties to Plaintiffs and the Class members.

6.      As a result of Devon's violations of its express and implied obligations under the relevant agreements and applicable Texas law, Plaintiffs and the Class have suffered substantial damages.

## II.    PARTIES

### A.    Plaintiffs

7.      Plaintiff Henry Seeligson is an individual residing and domiciled in Dallas, Texas and a citizen of the State of Texas.  Throughout the Class Period, Henry Seeligson had oil and gas leases with Defendant for Texas wells in Denton County, Texas and elsewhere that produced gas that was moved, gathered, transported and/or processed through the Bridgeport Plant, and suffered injuries as a result of the conduct set forth herein.

8.      Plaintiff John Seeligson is an individual residing and domiciled in Dallas, Texas and a citizen of the State of Texas.  Throughout the Class Period, John Seeligson had oil and gas leases with Defendant for Texas wells in Denton County, Texas and elsewhere that produced gas that was moved, gathered, transported and/or processed through the Bridgeport Plant, and suffered injuries as a result of the conduct set forth herein.

9.      Plaintiffs Suzanne Seeligson Nash is an individual residing and domiciled in Dallas, Texas and a citizen of the State of Texas.  Throughout the Class Period, Suzanne Seeligson had oil and gas leases with Defendant for Texas wells in Denton County, Texas and

elsewhere that produced gas that was moved, gathered, transported and/or processed through the Bridgeport Plant, and suffered injuries as a result of the conduct set forth herein.

10. Plaintiff Sherri Pilcher is an individual residing and domiciled in Dallas, Texas and a citizen of the State of Texas. Throughout the Class Period, Sheri Pilcher had oil and gas leases with Defendant for Texas wells in Denton County, Texas and elsewhere that produced gas that was moved, gathered, transported and/or processed through the Bridgeport Plant, and suffered injuries as a result of the conduct set forth herein.

### B.   Defendants

11. Defendant Devon Energy Production Company, L.P. ("Devon") is an Oklahoma limited partnership authorized to do business in Texas and operates oil and gas wells in Denton County, Texas. Devon's only general partner is DVN Operating Company, L.L.C., which has one member, Devon OEI Operating, L.L.C., which also has one member, Devon OEI, L.L.C. Devon OEI, L.L.C. is wholly owned by Devon OEI Holdings, Inc., a Delaware corporation with its principal place of business in Oklahoma. Devon OEI Holdings, Inc. is directly owned by DEC.

12. DEC is the ultimate parent company of both Devon and DGS. Devon, DGS, DEC, and other DEC affiliates share "(1) common officers, directors, and employees (paid and employed by Defendant); (2) common ownership; (3) common financial interest and control; (4) the same offices, business names, and logos; (5) comingled property; (6) consolidated financial statement and tax returns; (7) shared services and capital expenses; and (8) common business identities in the ordinary course of business."[1]

---

[1] *Shoop v. Devon Energy Prod. Co., L.P.*, No. 3:10-cv-00650-P, 2013 U.S. Dist. LEXIS 188345, at *51 (N.D. Tex. Mar. 28, 2013).

13.     Devon and its affiliates consider and treat themselves as a single entity and Devon encouraged royalty owners to consider its affiliates "one big company."[2] The management and operations are assimilated to the extent that Devon and DGS are simply names or conduits through which DEC, the parent, conducts its business.

14.     The seven most senior officers of Devon, DGS and DEC are all the same and have been the same during the relevant time period. DEC, Devon, DGS and other Devon affiliates all share common offices since October 2012 at 333 West Sheridan, Oklahoma City, Oklahoma 73102 and prior to October 2012 at 20 North Broadway, Oklahoma City, Oklahoma 73102, which is/was the principal place of business for Devon, DEC, and DGS.[3]

15.     Devon and DGS share mutual operations and Devon's positive operating capital may be used to cover DGS's operating capital needs.[4] Devon even funded DGS's costs for processing gas. From 2004 through 2010 alone, Devon transferred over $1 billion to DGS for gas processing.[5] Devon and DGS in reality operate as a single unified company.

16.     Defendant has been the subject of a prior lawsuit related to its underpayment of royalties to oil and gas lessors. *See Shoop, et al., v. Devon Energy Production, Co., L.P.,* No. 10-cv-650 (N.D. Tex.) ("*Shoop*"). On March 28, 2013, the Honorable Jorge A. Solis entered an order denying, in part, Devon's motion for summary judgment in *Shoop*.[6] Among other things, Judge Solis held:

---

[2] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *7.

[3] Plaintiff's First Amended Complaint, ECF No. 69 at 22, *Shoop v. Devon Energy Prod. Co., L.P.*, 3:10-cv-00650-P (N.D. Tex.).

[4] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *8.

[5] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *8.

[6] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *3.

(a) Genuine issues of material fact exist as to whether Devon and its affiliate, DGS, entered into sham transactions with regard to the sale of gas extracted from royalty owners' wells and sold from Devon to DGS;[7]

(b) Genuine issues of material fact exist as to whether Devon and DGS structured a wellhead sale that was "atypical and commercially unreasonable";[8]

(c) Genuine issues of material fact exist as to whether the sales between Devon and DGS should be disregarded as a sham because Devon and DGS are united;[9] and

(d) Genuine issues of material fact exist as to whether Devon breached the implied covenant to market by engaging in self-dealing and negligence.[10]

17. Approximately three months after Judge Solis' summary judgment ruling, the *Shoop* action was dismissed following a settlement between the parties. *See Shoop*, ECF No. 172.

### III. JURISDICTION AND VENUE

18. The Court has jurisdiction pursuant to 28 U.S.C. §1332(d) because Plaintiffs and members of the Class are citizens of a state different from the Defendant, and the amount in controversy exceeds $5 million.

19. The Court has personal jurisdiction over Defendant because Devon is authorized to do business in Texas, regularly conducts business in Texas, and has committed the acts complained of herein, within this judicial district in Texas.

---

[7] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *50-51.

[8] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *48.

[9] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *51.

[10] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *46.

20. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as Defendant is deemed to reside in this district and oil and gas wells at issue in the litigation are located in Denton County, and a substantial part of the events or omissions giving rise to the claims alleged herein—namely, Devon's purported sham sales to DGS—occurred in Denton County.

## IV.   FACTUAL BACKGROUND

### A.   Devon Ensures That All Roads Lead to the Bridgeport Plant

21. Plaintiffs and Class members own royalty interests in Texas wells that produce gas that was moved, gathered, transported and/or processed through the Bridgeport Plant. Devon is the operator of such wells and/or the entity required to remit revenue to Plaintiffs and Class members.

22. All of the gas subject to this action was moved, gathered, transported and/or processed through the Bridgeport Plant by DGS.

23. Once gas arrives at the Bridgeport Plant, raw "wet" natural gas is processed by the Plant to remove contaminants and to separate the methane portion of the gas, i.e., the dry "residue gas," and NGLs so that the methane gas is suitable for injection or delivery into gas transmission pipelines and marketable for sale at the tailgate of the Plant.

24. As part of the processing activities at the Plant, certain volumes of NGLs are processed and fractionated (or separated) into their separate components, which are ethane, propane, butane, isobutane and natural gasoline for sale.

25. Devon "sells" all of the gas and associated NGLs produced from those properties in which Plaintiffs and Class members own royalty interests to its affiliate, DGS, under the terms of the Gas Purchasing and Processing Agreement ("GPPA").[11] The GPPA, executed in 2005 but

---

[11] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *4.

7

effective June 2000, states that the sale of gas from Devon to DGS occurs at the point of delivery, and restricts Devon from negotiating different terms for the sale of gas to DGS over a 28 year period.[12] The GPPA establishes a pricing scheme whereby the value of residue gas is determined monthly by an unspecified "price index."[13] The value of the NGLs each month is determined by "a weighted average configured by the net average local sales price, less a marketing fee, in combination with a price index."[14]

26. Devon's starting point for calculating royalties for gas is to use the weighted average of *Inside FERC*'s published index gas prices for residue gas (subject to adjustments or deductions), and, for NGLs, the weighted average of the prices for NGLs sold at the Plant and the published *Mt. Belvieu OPIS* prices for NGLs sold at other locations.

27. After the weighted averages of the index-based prices is determined, Devon then (i) calculates prices by multiplying the weighted averages of published gas and NGL index-based prices less adjustments or deductions by an arbitrary percentage (that is less than 100%) and (ii) deducts from those prices certain other post-production fees, costs and expenses to arrive at a net price.

28. Under the GPPA pricing scheme, Devon ultimately receives 82.5% of the weighted average price of the residue gas and NGLs processed by DGS, ***while DGS retains a fee of 17.5%***.[15] The 17.5% fee retained by DGS is neither reasonable nor related to actual costs or fees incurred and is hidden by Devon in its royalty statements; the statements do not include all of the information related to pricing and deductions, provide less information than required by

---

[12] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *4-5.

[13] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *5-6.

[14] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *6.

[15] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *5.

Texas law, and are insufficient to enable Plaintiffs and Class members to determine exactly how Devon calculated the royalty.

29.     Further, the GPPA specifically required that DGS not profit at Devon's expense. "[U]nder the Transfer Pricing Guidelines—as applicable to the GPPA—DGS may not make a profit at the expense of Defendant (i.e. sell gas to third parties at prices higher than the transfer prices under the GPPA)."[16]  Devon never enforced the Transfer Pricing Guidelines under the GPPA but, instead, allowed DGS to make unaccounted for profits from sales to unaffiliated third parties, contrary to the GPPA.  The profits ultimately benefitted Defendant and its affiliates.

**B.     The Sales of Gas from Devon to DGS Are Sham Transactions**

30.     By forcing the gas extracted from Plaintiffs' and the Class's wells to the Bridgeport Plant with an associated artificial "fee", Devon created a built-in profit center through DGS where Plaintiffs and the Class are forced to pay artificially inflated fees.

31.     Devon purports to justify its underpayment of royalties through the artifice that it separately "sells" the NGLs and the residue gas to DGS, at the well.  However, the purported sale of gas from Devon to DGS, with the concomitant 17.5% fee, is a sham transaction structured solely to increase profits for Devon and its affiliates at the expense of Plaintiffs and the Class. Devon cannot use sham sales as a vehicle to unfairly deprive Plaintiffs and Class members of their rightful royalties in violation of their leases and Texas law.[17]

32.     The sham sales also breach the implied covenant to market that arises under Texas law.  The implied covenant requires the lessee to manage and administer the lease and

---

[16] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *6.

[17] *Shoop*, 2013 U.S. Dist. LEXIS 188345, at *49-50.

reasonably market the oil and gas.[18]  The standard required in discharge of this duty is that of highest good faith or the best of good faith.  The duty exists to protect lessors from a lessee's self-dealing and negligence, and reasonableness is viewed in light of the lessee's actual conduct.[19]

33.     Devon breached the implied covenant to market as a reasonably prudent operator by entering into phony sham transactions with DGS and/or other affiliates designed to deprive Plaintiffs and Class members of their rightful royalties, while simultaneously generating unlawful and unfettered profits for Defendants and their affiliates.

34.     Devon's use of sham transactions to enrich itself and its affiliates was not limited to the phony 17.5% fee.  Once the gas left the Plant, DGS sold the residue gas and NGLs in bona fide arm's length sales to unaffiliated third parties for a profit.   None of the royalties paid to Plaintiffs and Class members are based on DGS's bona fide arm's-length sales of the gas to third parties.  Instead, Devon calculates the royalties it pays to Plaintiffs and Class members based on the artificial "price" it manufactured as part of its sham transaction with DGS rather than the (higher) price that DGS receives from unaffiliated third parties, which includes a profit.  But the GPPA specifically required that DGS not profit at Devon's expense.[20]  Yet Devon never enforced the Transfer Pricing Guidelines under the GPPA and instead allowed DGS to make unaccounted for profits from sales to unaffiliated third parties, contrary to the GPPA.

35.     Part and parcel with its sham sales to DGS, Devon failed to market the gas at a reasonable price, failed to monitor DGS's profits on sales of residue gas and NGLs to

---

[18] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *47.

[19] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *47.

[20] *Shoop,* 2013 U.S. Dist. LEXIS 188345, at *6.

unaffiliated third parties, and failed to take action to recover any difference for Plaintiffs and Class members. Devon negligently or willfully failed to require DGS to provide an accounting of its profits to Devon and, ultimately, the royalty owners.

36. Devon's failure to enforce the Transfer Pricing Guidelines under the GPPA and its self-dealing by agreeing to terms in order to benefit itself and its affiliates constitute breaches of the underlying agreements and the implied covenants[21] recognized by Texas law and warrant the imposition of punitive damages.

37. The sham sales to DGS are used by Devon to circumvent its express and implied obligations under the leases, are not actual sales, and should be disregarded. As explained by the *Shoop* court:

> a fact issue remains that ***Defendant may have violated its implied covenant to market***. Zeroing in on Defendant's actions, if Defendant is indeed not enforcing the Transfer Pricing Guidelines as the evidence suggests, it would be acting negligently in breach of its implied covenant to market. Beyond this, viewed in the light most favorable to Plaintiffs, Defendant may have agreed to certain terms in order to benefit itself and other Devon affiliates. This creates a fact issue related to self-dealing. Importantly, while Defendant argues that no other purchaser would or even could pay a higher price than DGS, this contention does not address its actual conduct or the suspect peripheral circumstances surrounding the GPPA arrangement. . . . Defendant cannot resolve or tie up the fact issues surrounding this request for summary judgment that implicates both self-dealing and negligence.
>
> Aside from implied covenants, ***a material fact issue remains regarding Plaintiffs' sham transaction theory for contractual liability***. A sham transaction may arise where a lessor has "used an arrangement with [its affiliates] to create an unfair device to deprive plaintiffs of their rightful royalties." *Tex. Oil & Gas Corp. v. Hagen*, 683 S.W.2d 24, 28 (Tex. App.—Texarkana 1984), writ dism'd as moot, 760 S.W.2d 960 (Tex. 1988); *see also Ramming v. Nat'l Gas Pipeline Co.*, 390 F.3d 366, 374 (5th Cir. 2004). The resultant legal effect is remedial in nature and allows a court to disregard the purported sale at the well and find that the true sale was off the premises. *See, e.g., Tex. Oil & Gas Corp.*, 683 S.W.2d at 28 ("By proof that Delhi, in this situation, was merely the alter ego of its parent TXO, the district court could disregard the purported sale at the wells and find that the true

---

[21] *See Shoop,* 2013 U.S. Dist. LEXIS 188345, at *48-49.

sale was off premises at the SWEPCO and IPC plants."). "The mere fact that a subsidiary is wholly owned by the parent and there is an identity of management does not justify disregarding the corporate entity of the subsidiary, but where management and operations are assimilated to the extent that the subsidiary is simply a name or a conduit through which the parent conducts its business, the corporate fiction may be disregarded in order to prevent fraud and injustice." *Id.* (citing *Gentry v. Credit Plan Corp. of Hous.*, 528 S.W.2d 571 (Tex. 1975); *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336 (Tex. 1968)). In short, alleging a sham transaction is a vehicle to disregard the lines between legally distinct entities in an effort to avoid a transaction without imputing liability.

*Shoop,* 2013 U.S. Dist. LEXIS 188345, at *48-9.

38. Plaintiffs have performed all obligations required by law and have satisfied all conditions precedent to bringing this action.

39. As a result of the manner and method of Devon's reporting and remittance of royalties, Devon's breaches of its express and implied obligations under the leases and Texas law have been inherently undiscoverable absent the full disclosure of such information by Devon. Plaintiffs and Class members did not know, and through the exercise of due diligence, could not have known of Devon's wrongful acts giving rise to their claims and damages prior to this litigation. Plaintiffs and Class members affirmatively plead the doctrines of fraudulent concealment and the discovery rule, and allege that their claims are not precluded by the statute of limitations.

## V.     CLASS ACTION ALLEGATIONS

40. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a),(b)(2) and/or (b)(3) on behalf of the following Class:

> All persons or entities who, from or after January 1, 2008, are or were royalty owners in Texas wells producing natural gas that was moved, gathered, transported and/or processed through the Bridgeport Gas Processing Plant in Wise County, Texas and received royalties from Devon Production Company, L.P. that were calculated based on Devon Production Company, L.P.'s sale of natural gas to Devon Gas Services, LP or one or more other affiliates of Devon Energy Corporation.

41. The persons or entities excluded from the Class are: (a) overriding royalty interest owners who derive their interest through the oil and gas lease; (b) all governmental entities, including federal, state and local governments and their respective agencies, departments, or instrumentalities; (c) the States and territories of the United States or any foreign citizens, states, territories or entities; (d) the United States of America; (e) publicly traded entities and their respective parents, affiliates, and related entities (f) owners of any interests and/or leases located on or within any federally created units; (g) owners of any non-operating working interest for which Devon Production Company, L.P. or its agents or representatives, as operator, disburses royalty; (h) any persons or entities that Plaintiffs' counsel is, or may be, prohibited from representing under the Texas Rules of Professional Conduct; (i) Devon Production Company, L.P. and any entity in which Devon Production Company, L.P. has a controlling interest, and their officers, directors, legal representatives and assigns; and (j) members of the judiciary and their staff to whom this action is assigned.

42. The Class is so numerous that joinder of all members is impracticable.

43. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

44. Plaintiffs' claims are typical of the claims of the Class. As alleged herein, Plaintiffs and members of the Class all sustained damages arising out of the Defendant's common course of unlawful conduct.

45. There are questions of law and fact common to the Class, including but not limited to:

- Whether Devon imposed unreasonable fees on royalty owners;
- Whether Devon imposed fees unrelated to actual costs on royalty owners;
- Whether Devon improperly deducted fees or costs from royalties;

- Whether Devon's transactions with one or more affiliates, including DGS, improperly reduced royalty payments to Plaintiffs and Class members;

- Whether transactions between Devon and one or more of its affiliates, including DGS, should be disregarded as sham transactions;

- Whether Devon failed to monitor DGS's profits on sales of residue gas and NGLs to unaffiliated third parties, and failed to take action to recover any difference for Plaintiffs and Class members;

- Whether Devon breached the implied covenant to market and failed to act as a reasonably prudent operator under the leases;

- Whether Devon failed to properly calculate and pay royalties;

- Whether Plaintiffs and Class members have suffered damage as a result of Defendants' conduct; and

- The appropriate measure of damages.

46. Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

47. Plaintiffs anticipate no difficulty in the management of this matter as a class action.

## VI.   COUNTS

### COUNT I

### Breach of Contract

48. The allegations of paragraphs 1 through 47 are incorporated by reference into this Count I as though fully set forth herein.

49. Devon's production of natural gas from certain Texas wells that was moved, gathered, transported and/or processed through the Bridgeport Plant is burdened by Plaintiffs' and Class members' royalty interests that derive from oil and gas leases. The leases are contracts

between Devon and the Plaintiffs and Class members.  The leases do not permit Devon to deduct artificial, inflated and unreasonable fees for costs, or base royalty calculations on sham contracts or transactions.

50.     Devon materially breached its obligation to pay royalties pursuant to these oil and gas leases through its persistent and regular practices of underpaying royalties.  Specifically, Devon materially breached the oil and gas leases by improperly deducting artificial, inflated and unreasonable fees from royalties owed to Plaintiffs and Class members.  Devon committed such breaches knowingly and intentionally through purported sales to one or more of its affiliates (including DGS), and then concealed the artificial, inflated and unreasonable fees from Plaintiffs and Class members.

51.     Additionally, Devon breached its obligation to pay royalties pursuant to these oil and gas leases by using sham contracts or transactions to impose artificial, inflated and unreasonable fees and deprive Plaintiffs and Class members of their rightful royalties.  Devon's purported sales to one or more of its affiliates (including DGS) must be disregarded as a matter of law because each was a sham transaction.  Devon cannot consistent with its obligations under the oil and gas leases and Texas law use DGS or other affiliates to do what it is otherwise prohibited from doing directly. Devon knowingly and intentionally used these sham arrangements to create an unfair device to impose artificial, inflated and unreasonable fees and deprive Plaintiffs and Class members of their rightful royalties.  Devon then knowingly and intentionally concealed the artificial, inflated and unreasonable fees from Plaintiffs and Class members.

52. The breaches by Devon were done intentionally to increase profits for itself and its affiliates (including DGS and DEC) by reducing the economic cost of the royalties through underpayment of royalties owed to Plaintiffs and Class members.

53. Devon's breaches of the leases caused injury to Plaintiffs and Class members.

54. As a direct and proximate result of Devon's actions, Plaintiffs and Class members have incurred actual damages, which they are entitled to recover from Devon.

55. Plaintiffs and Class members are entitled to recover their reasonable and necessary attorney's fees and litigation costs and expenses incurred in the prosecution of this claim, pursuant to TEX. CIV. P. & REM. CODE § 38.001 et seq.

## COUNT II

### Breach of Implied Covenant to Market and Duty of Good Faith

56. The allegations of paragraphs 1 through 47 are incorporated by reference into this Count II as though fully set forth herein.

57. Devon is subject to an implied covenant to manage and administer the leases it obtained from Plaintiffs and Class members. The implied covenant to manage and administer includes the implied covenant to market, which extends to the Plaintiffs and Class members. Under that implied covenant, at all times, Devon was and is obligated to market the natural gas production in accordance with the standard of a reasonably prudent operator. Devon also owes each royalty owner a duty of good faith. These implied covenants protect the lessors (Plaintiffs and the Class members) from self-dealing and negligence.

58. Devon breached its implied covenant to market and duty of good faith by failing to act as a reasonably prudent operator by structuring sham sales to one or more affiliates, including DGS, in a manner that was intended to deprive Plaintiffs and Class members of benefits of their lease agreements—specifically, their rightful royalties. Devon, in violation of

its implied covenant to market and duty of good faith, used the GPPA and sham sales to one or more affiliates, including DGS, to benefit itself while simultaneously imposing upon Plaintiffs and Class members artificial, inflated and unreasonable fees.  Devon's imposition of such fees frustrated the purpose of the leases.

59. Devon also breached its implied covenant to market and duty of good faith because, notwithstanding its transfer pricing guidelines applicable to the GPPA, it failed on an ongoing basis to monitor actual, higher prices received by DGS from third parties and failed to take appropriate action to recover the difference for Plaintiffs and Class members.

60. As stated above, Devon's breaches of the implied covenant are accompanied by both negligence and self-dealing.

61. Based on the foregoing and other matters alleged herein, Devon has failed to act in good faith, consistent with its implied covenant to market, and as a reasonably prudent operator.

62. Devon's acts were deliberately undertaken to wrongfully deprive Plaintiffs and Class members of their lawful rights and interests, including the right to receive full and proper royalties.

63. Devon's breach of the implied covenant to market and duty of good faith caused injury to Plaintiffs and Class members.

64. As a direct and proximate result of Devon's breaches, Plaintiffs and Class members have incurred actual damages, which they are entitled to recover from Devon. Moreover, Devon's conduct as described herein warrants the imposition of exemplary damages.

65. Plaintiffs and Class members are entitled to recover their reasonable and necessary attorney's fees and litigation costs and expenses incurred in the prosecution of this claim, pursuant to TEX. CIV. P. & REM. CODE § 38.001 et seq.

## VII. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the members of the Class and award the following relief:

(a) Order that this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class and Plaintiffs' counsel as counsel for the Class;

(b) Declare, adjudge and decree that the conduct alleged herein is unlawful;

(c) Declare that Devon has failed to properly calculate and pay royalty to Plaintiffs and members of the Class, and otherwise determine the rights and obligations of the parties;

(d) Award compensatory damages, exemplary damages, statutory interest, pre-judgment interest, post-judgment interest, attorney's fees and court costs as permitted by law;

(e) Award such other relief as the Court deems just and equitable.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 24, 2014

Respectfully submitted,

By: */s/ George L. McWilliams*
George L. McWilliams
Texas Bar No. 13877000
**LAW OFFICES OF GEORGE L. McWILLIAMS, P.C.**
P.O. Box 58
Texarkana, Texas-Arkansas 75504
Tel: (870) 772-2055
Fax: (870) 772-0513
Email: glmlawoffice@gmail.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Joseph H. Meltzer
Pennsylvania Bar No. 80136 (*pro hac vice motion to be filed*)
Peter A. Muhic
Pennsylvania Bar No. 73501 (*pro hac vice motion to be filed*)
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Email: jmeltzer@ktmc.com
Email: pmuhic@ktmc.com

**MATTHEW TYLER SHOOP, ATTORNEY AT LAW**
Matthew Tyler Shoop
Texas State Bar No. 24070613
4525 Emerson Ave., No. 2
Dallas, TX 75205
Tel: (310) 729-5700
Email: tylershoop@gmail.com

**KEIL & GOODSON P.A.**
Matt Keil
Texas Bar No. 11181750
Arkansas Bar No. 86099
John C. Goodson
Arkansas Bar No. 90018 (*pro hac vice motion to be filed*)
406 Walnut Street
Texarkana, Arkansas 71854
Tel: (870) 772-4113
Fax: (870) 773-2967
Email: mkeil@kglawfirm.com
Email: jcgoodson@kglawfirm.com

**WICK PHILLIPS GOULD
& MARTIN, LLP**
David Drez
Texas Bar No. 24007127
100 Throckmorton Street, Suite 500
Fort Worth, Texas 76102
Tel: (817) 332-7788
Fax: (817) 332-7789
Email: david.drez@wickphillips.com

**MATTINGLY & ROSELIUS, PLLC**
Jason E. Roselius
Oklahoma Bar No. 16721 (*pro hac vice motion to be filed*)
Brian L. Cramer
Oklahoma Bar No. 20661 (*pro hac vice motion to be filed*)
13182 N. MacArthur Blvd.
Oklahoma City, Oklahoma 73142
Tel:  (405) 603-2222
Fax:  (405) 603-2250
Email: jason@mroklaw.com
Email: brian@mroklaw.com

**SEIDEL LAW FIRM, P.C.**
Brad E. Seidel
Texas Bar No. 24008008
6 Hedge Lane
Austin, Texas 78746
Tel: (512) 537-0903
Email: bradseidel@me.com

*COUNSEL FOR PLAINTIFFS HENRY SEELIGSON, JOHN M. SEELIGSON, SUZANNE SEELIGSON NASH, AND SHERRI PILCHER AND PROPOSED LEAD COUNSEL FOR THE CLASS*