## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HENRY SEELIGSON, JOHN M. SEELIGSON, SUZANNE SEELIGSON NASH, and SHERRI PILCHER, individually and on behalf of all others similarly situated, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | Civil Action No. 3:16-CV-00082-K |
| DEVON ENERGY PRODUCTION COMPANY, L.P., | § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Supplemental Motion for Class Certification (Doc. No. 208) ("The Motion"). After reviewing The Motion, response, reply, relevant portions of the record, evidence submitted by the parties, and the applicable law, the Court **GRANTS** Plaintiffs' Motion. Because Defendant applied a uniform pricing structure to every member of the class, the Court finds that damages and breach can be shown on a classwide basis. Because Texas employs a "categorical" approach to the discovery rule, the Court finds that statute of limitation and discovery rule issues do not predominate over common questions.

### I.      Factual Background

Henry Seeligson, John M. Seeligson, Suzanne Seeligson Nash, and Sherri

1

Pilcher (collectively, the "Proposed Class Representatives," or "Plaintiffs") brought this action on behalf of similarly situated royalty owners alleging that Defendant Devon Energy Production Company, L.P. ("DEPCO") improperly and intentionally underpaid royalties owed to Plaintiffs and class members for gas that was processed through the Bridgeport Gas Processing Plant (the "Bridgeport Plant").

Plaintiffs and proposed class members own or owned royalty interests in wells that produce gas that was processed through the Bridgeport Plant of DEPCO (the "Class Wells"). DEPCO serves as either the lessee, operator, or the entity required to remit revenue to royalty owners for the Class Wells. In some instances, DEPCO assumes all three of these roles. DEPCO sold residue gas and natural gas liquids ("NGLs") from the Class Wells at or near the wellhead to Devon Gas Services, LP ("DGS"). The relevant leases provide that on gas sold at the wellhead, "the royalty shall be one-eighth of the net proceeds received from such sale," whereas for gas sold or used off the premises, the royalty shall be "the market value at the well of one-eighth of the gas so sold or used." These sales are governed by one common contract—the Gas Purchasing and Processing Agreement ("GPPA"). Under the GPPA, DGS purportedly paid DEPCO prices equal to 82.5% of the value of the residue gas and NGLs and deducted 17.5% as a processing fee.

Plaintiffs claim that DEPCO improperly passed the 17.5% fee on to them and all class members by reducing their royalty payments by 17.5%. Plaintiffs allege that this processing fee was artificially inflated and that it resulted in a price or value that

was substantially lower than any price or value a prudent or diligent operator would have obtained under the same or similar facts or circumstances. Plaintiffs further contend that DEPCO could have reasonably obtained a higher price or value through a lower processing fee from DGS but failed to do so in order to secretly create a lucrative profit center for DEPCO, DGS, and their parent company, Devon Energy Corporation, at the expense of Plaintiffs and the Class. Plaintiffs point to the contracts between DGS and other producers such as Enervest and Cross-Tex, which processed gas at roughly one-third the cost charged to DEPCO. Plaintiffs argue that the notably lower processing fees are evidence that DGS did not act as a reasonably prudent operator in procuring the 17.5% rate.

## II. Procedural Background

### A. District Court Proceedings

Plaintiffs filed this case in the Eastern District of Texas, a district in which some of their wells are located. On October 22, 2015, DEPCO filed an Emergency Motion to Stay the proceedings in the Eastern District pending resolution of Defendant's Motion to Transfer Venue. Ultimately, this case was transferred to the Northern District of Texas on January 12, 2016. On February 11, 2016, this Court denied Plaintiffs' Motion for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel. On February 25, 2016, Plaintiffs filed a motion asking the Court to reconsider its order denying class certification and for leave to file a second class certification motion. The Court held a hearing on these Motions on May 4, 2016

where counsel for all parties presented argument and evidence on Plaintiffs' Motions. Following the hearing, the Court granted Plaintiffs' Motion to Reconsider Order Denying Class Certification and certified the following class:

> All person or entities who, between January 1, 2008 and February 28, 2014, (i) are or were royalty owners in Texas wells producing natural gas that was processed through the Bridgeport Gas Processing Plant by Devon Gas Services, LP ("DGS"); (ii) received royalties from Devon Production Company, L.P. ("DEPCO") on such gas; and (iii) had oil and gas leases that were on one of the following forms: Producers 88-198(R) Texas Paid-Up (2/93); MEC 198 (Rev. 5/77); Producers 88 (Rev 10-70 PAS) 310; Producers 88 Revised 1-53—(With Pooling Provision); Producers 88 (2-53) With 640 Acres Pooling Provision; Producers 88 (3-54) With 640 Acres Pooling Provision; Producers 88 (4-76) Revised Paid Up with 640 Acres Pooling Provision; Producers 88 (7-69) With 640 Acres Pooling Provision; and Producers 88 (Rev. 3-42) With 40 Acres Pooling Provision ("The Class Lease Forms").
>
> The persons or entities excluded from the Class are: (a) overriding royalty interest owners who derive their interest through the oil and gas lease; (b) all governmental entities, including federal, state and local governments and their respective agencies, departments, or instrumentalities; (c) the States and territories of the United States or any foreign citizens, states, territories or entities; (d) the United States of America; (e) publicly traded entities and their respective parents, affiliates, and related entities; (f) owners of any interests and/or leases located on or within any federally created units; (g) owners of any non-operating working interest for which DEPCO or its agents or representatives, as operator, disburses royalty; (h) DEPCO and any entity in which DEPCO has a controlling interest, and their officers, directors, legal representatives and assigns; and (i) members of the judiciary and their staff to whom this action is assigned.

Defendant requested and was granted an interlocutory appeal under Rule 23(f).

B. Fifth Circuit

On appeal, a unanimous panel of the Fifth Circuit issued an unpublished opinion on October 16, 2018, affirming much of this Court's holding, but remanding on one predominance issue. Defendant petitioned for a Panel Rehearing and Rehearing En

Banc. The Fifth Circuit denied the petitions but substituted a new, unpublished opinion on February 20, 2019. The Opinion affirmed a substantial majority of this Court's holding and remanded on two specific issues, one regarding commonality and one regarding predominance. Defendant did not challenge the Court's rulings regarding numerosity, typicality, adequacy of representation, and superiority. *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019). The Fifth Circuit affirmed the Court's decision that the Class of royalty owners was ascertainable, holding that "both DEPCO and the public records provide sufficient objective criteria from which to identify class members." *Id*. The Fifth Circuit also affirmed the Court's finding that all of the class leases imposed the same duty to market, rejecting Defendant's argument that the express marketing clause imposed a different standard than the duty implied at law. *Id*. at 336. On the topic of breach, the Fifth Circuit determined that "it is possible that Plaintiffs could demonstrate that DEPCO breached its implied duty to market by basing its price on a higher processing fee than the fee that a 'reasonably prudent operator would have received at the wellhead.'" *Id*. at 337. The Panel held that "[the district] court did not abuse its discretion in determining that whether DEPCO breached its duty to Plaintiffs was a common question capable of classwide resolution." *Id*. at 337 n.42.

While acknowledging that the Court did not abuse its discretion in finding that breach was capable of being determined on a classwide basis, the Fifth Circuit remanded "for further consideration whether additional specific evidence supports the

5

conclusion that the breach of the duty to market and damages from any breach can be evaluated classwide or if a well-by-well analysis is required." *Id.* at 337. The Fifth Circuit also instructed the Court to determine whether statute of limitations and tolling inquiries would predominate over common questions of law or fact. *Id.* at 339.

## III.    Applicable Law

Once the party seeking certification establishes that a putative class is definable and ascertainable, which Plaintiffs have achieved, that party must demonstrate that the putative class meets all four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the three requirements of Federal Rule of Civil Procedure 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).  Under Rule 23(a), the party seeking certification must first demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable,
> (2) there are questions of law or fact common to the class,
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b), which are:

> (1) prosecuting separate actions by or against individual class members would create risk of:
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly or efficiently adjudicating controversy.

FED. R. CIV. P. 23(b).

Plaintiffs bear the burden of showing that class certification is appropriate. *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005). Class certification is at the discretion of this Court, which has inherent power to manage and control pending litigation. *Fener v. Operating Eng'r Const. Indus. & Miscellaneous Pension Fund (Local 66)*, 579 F.3d 401, 406 (5th Cir. 2009). Although a court does not reach the merits of the case in evaluating whether class treatment is appropriate, it may look past the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law to make a meaningful decision on class certification. *Unger*, 401 F.3d at 321. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Defendant did not challenge this Court's findings as to numerosity, superiority, representativeness, and typicality while the Fifth Circuit affirmed the Court's finding

regarding ascertainability. *Seeligson*, 761 F. App'x at 334. The remaining issues engage specific aspects of commonality under 23(a) and predominance under 23(b). To satisfy Rule 23(a)'s commonality requirement, Plaintiffs have to demonstrate that there are questions of law or fact common to the class. *Id*. A common question must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. *Id*. A Rule 23(b) predominance inquiry "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Id*. at 338.

## IV.    Analysis

The issues before the Court include: 1) Whether specific evidence supports the proposition that breach and damages can be established on a classwide basis and 2) Whether statute of limitations and discovery rule inquiries predominate common questions. Critical to the Court's analysis of breach and damages is a finding that the proposed alternative rate can be found on a classwide basis. Because the alternative rate can be shown classwide, and Defendant applied the same pricing mechanism to every member without regard to individual well characteristics, the Court finds that breach is a common question capable of classwide resolution. Because Plaintiffs have identified a formula that would adequately measure the alleged breach, the Court finds

that damages are similarly susceptible to classwide resolution. Because Texas employs a "categorical" approach to the discovery rule, asking whether the 17.5% rate was discoverable as an objective matter, the individual issues of tolling will not predominate over the common question of breach.

A.   The Court finds that breach can be decided on a classwide basis

Because Plaintiffs can demonstrate what rate a reasonably prudent operator would have received on a classwide basis, the Court finds that breach can subsequently be shown classwide. Although the Fifth Circuit acknowledged that "[the district] court did not abuse its discretion in determining that whether DEPCO breached its duty to plaintiffs was a common question capable of classwide resolution," it nonetheless remanded for further consideration of specific evidence of whether breach can be determined classwide. *Seeligson*, 761 F. App'x at 337 n.42.  Though the Court did not abuse its discretion in deciding that the breach question was capable of classwide resolution, the Fifth Circuit wants it to go further in its analysis. Because the common duty to market is established, the Court interprets the directive to determine whether Plaintiffs would be able to show what rate a reasonably prudent operator *would have received* (the Reasonably Prudent Operator Rate, or "RPO rate") on a classwide basis. This analysis is relevant to determining whether both breach and damages are common questions capable of classwide resolution. Because gas is bought and sold under one contract and the RPO rate inquiry does not require proof of other sales, the Court finds that a proposed RPO rate would be "applicable to the class as a whole" and be "subject

to generalized proof." *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671, 676 (5th Cir. 1982).

   i.    *The Court finds that an alternative rate can be shown on a classwide basis*

Because the duty to market is established classwide, the next question is whether Plaintiffs can provide evidence of breach that is generalized and common to the class. "The legal requirement that class members have all 'suffered the same injury' can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse." *In re Deepwater Horizon*, 739 F.3d 790, 810–11 (5th Cir. 2014). It is established that Defendant owed a uniform duty to market to every member of the class. *See Seeligson*, 761 F. App'x at 336 ("The district court did not abuse its discretion in holding that DEPCO owed all class members the same duty, under either the express marketing clause or the implied duty to market."). "The duty DEPCO owed to the royalty owners was an obligation to obtain the best current price reasonably available [for the gas]." *Id.* (citing *Union Pac. Res. Grp., Inc. v. Hankins*, 111 S.W.3d 69, 71 (Tex. 2003)). To determine whether DEPCO breached that duty, the jury would still need to determine "the price a reasonably prudent operator would have received at the wellhead." *Id.* To satisfy the commonality requirement under Rule 23(a)(2), the parties at this stage need only to provide evidence to demonstrate that a contention is common, but not that it is correct—the Court refrains from resolving questions of merit where possible at this stage so long as Plaintiffs show the claim is common to the class. *See Deepwater Horizon*, 739 F.3d at

811. The contention here is that the 17.5% rate in the GPPA, which applied to every class member without regard to origin or specific characteristics, was a violation of the duty to market because a reasonably prudent operator would have achieved a lower rate. Because this contention is common to the class, related to the same injurious conduct, and susceptible to generalized evidence, the Court finds that breach can be determined on a classwide basis.

The Court finds that because all of the gas at issue was processed at one gas processing plant and sold by DEPCO to DGS on an aggregate, classwide basis pursuant to a common contract demonstrates that an alternative rate can also be shown on a classwide basis. Because the alternative rate can be shown on a classwide basis, whether the rate employed by Defendant constitutes a breach can also be shown. When examining whether breach occurred, "[t]he *Bowden* court explained that variations in well locations, quality of production, and field regulations, among other factors, will require the jury to conduct a well-by-well analysis ... *unless the class offers particular evidence that the gas price at the wells can be evaluated classwide.*" *Seeligson*, 761 F. App'x at 336 (citing *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 701–02 (Tex. 2008)) (internal quotations removed). This includes "if a class offered evidence that [the defendant] was artificially lowering the prices it charged [its affiliate] for gas sales across the board or that [it] was systematically miscalculating the royalty payments, such claims might be more susceptible to certification." *Id*. at 336–37 (citing *Bowden*, 247 S.W.3d at 702 n.5).

Here, the 17.5% rate was "systematically" applied to every lease without regard to its specific characteristics or origin. Both this Court and the Fifth Circuit found that "Devon Energy used its multi-subsidiary, uniform pricing gimmick for each and every well in the system, regardless of location, lease differences, etc." *Id.* at 337. Because the 17.5% off-the-top applied to every class member, the class could provide generalized, common proof that this rate was an "artificial" mechanism used to lower the price of gas sales across the board. Defendant similarly will have the opportunity to provide evidence that the 17.5% was a reasonably prudent rate to apply and not an artificial reduction. Either way, whether the rate was artificial or not will be determined in a "single stroke" for all members of the class.

ii. *Plaintiffs do not need evidence of other sales to demonstrate a breach of the reasonably prudent operator standard*

Plaintiffs do not need to show evidence of other sales to demonstrate that a breach of the duty to market occurred. Defendant's primary contention is that the lack of evidence of other sales means the class cannot show a breach of the duty to market. "The implied covenant to reasonably market. . .focuses on the behavior of the lessee rather than on evidence of other sales and asks whether the lessee acted as a reasonably prudent operator under the same or similar facts and circumstances." *Hankins*, 111 S.W.3d at 71 (citing *Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 567–68 (Tex.1981)); *see also Occidental Permian Ltd. v. Helen Jones Found.,* 333 S.W.3d 392, 401 (Tex. App.—Amarillo 2011, pet. denied) (citing *Hankins,* 111 S.W.3d at 71) ("[I]n an

evaluation of the sufficiency of the evidence it breached its duty to reasonably market the casinghead gas, our inquiry must focus on its behavior, not on evidence of other sales."). The Fifth Circuit explained that these implied covenants exist "[t]o balance the significant powers vested in the lessee against the lessor's interest in seeing the lease developed, and to discourage the lessee from considering only its own interests when a conflict of interest develops." *Davis v. CIG Expl., Inc.*, 789 F.2d 328, 332 (5th Cir. 1986). Because of the "significant powers vested" and the isolating nature of lessor-lessee relationships, "every claim of improper operation by a lessor against a lessee should be tested against the general duty of the lessee to conduct operations as a reasonably prudent operator in order to carry out the purposes of the oil and gas lease." *Amoco Prod. Co.*, 622 S.W.2d at 568.

Because the reasonably prudent operator inquiry does not require evidence of other sales, there is no reason to now even consider that the lack of other sales for this combination of class leases precludes an alternative rate from being determined in the aggregate. Defendant argues that the breach inquiry must be well-by-well in order to determine what alternative rate each well could have received, and seems to raise this argument under both the commonality and predominance inquiries. If the inquiry required a well-by-well analysis of breach, then DEPCO would be correct that individual questions would predominate and class certification would fail under 23(b)(3). But the breach inquiry does not require well-by-well analysis because DEPCO applied the 17.5% to the class leases in the aggregate. Defendant relies on the

fact that Plaintiffs' experts are not able to provide evidence that another company would have processed all of the gas in the proposed class. Defendant's argument misunderstands the reasonably prudent operator analysis because it proceeds under the premise that Plaintiffs must show evidence of other sales to prevail in the first place. Nor does Defendant's argument impact the Court's 23(a) analysis because the lack of other sales does not negate the common question of whether 17.5% was the rate a reasonably prudent operator would have achieved.

In *Hankins*, the Texas Supreme Court held that a class challenging the propriety of a marketing fee (a proxy for the "processing fee" in this case) would not be certified because the class contained market value leases. A "market value" or "market price" clause requires payment of royalties based on the prevailing market price for gas in the vicinity at the time of sale, irrespective of the actual sale price. *Bowden*, 247 S.W.3d at 699. By contrast, "Proceeds" or "amount realized" clauses require measurement of the royalty based on the amount the lessee in fact receives under its sales contract for the gas. *Id*. The Texas Supreme Court in *Hankins* held that market value leases could not be certified because they require individualized inquiry and already had protection from abuse by setting royalties on objective measures. *Hankins*, 111 S.W.3d at 74. The Texas Supreme Court then cited *Amoco* to "contrast" between the inquiry required of market value leases and the inquiry applied to proceeds leases. *See id*. at 71 (citing *Amoco Prod. Co.,* 622 S.W.2d at 567–68). Because proceeds leases were not protected by objective measures such as market value, the Texas Supreme Court held that a sham

transaction (or improper fee) would create liability for an operator. *Id*. at 75 ("[A] finding that Union Pacific engaged in a sham transaction might affect the outcome of the proceeds owners' claims but would not determine its liability to the market-value owners."). This logic would necessarily extend to a class composed of entirely proceeds leases if every lease was injured by the same improper fee.

The Court understands the reliance on *Amoco*, combined with the explicit reference to proceeds leases, to mean that a proceeds class who had the same fee applied across the board could present evidence that a reasonably prudent operator would have applied a lower fee (or none at all). The entire class in this case is composed of proceeds leases. The gas was sold under one contract, and the fee applied in the aggregate. Transcript of Hearing on Motion to Reconsider Order Denying Class Certification and Motion for Class for Class Certification at 47. Plaintiffs' theory of breach is that a reasonably prudent operator would have achieved a lower fee. At the class certification stage, the Court asks whether the contention is common, not whether it is correct. *See Deepwater Horizon*, 739 F.3d at 811. Lessors in this case have composed the class by following the guidance provided by the Texas Supreme Court and limited their claim to proceeds leases only. After fleshing out the analysis at the Fifth Circuit's request, the Court has the same opinion regarding the viability of the Class under Texas law.

Plaintiffs' evidence of other prices charged for gas filtered through BPS, though not required, are examples of "generalized, classwide proof" that will aid a jury in determining whether DEPCO acted as a reasonably prudent operator when negotiating

the 17.5% rate. Relevant evidence is that Devon Gas Services, when negotiating at arms-length, allegedly applied a processing cost that is one-third of the total price charged to DEPCO, its affiliate. *See* Transcript of Hearing on Motion to Reconsider Order Denying Class Certification and Motion for Class for Class Certification at 24 (examining that the contract between Enervest and DGS charged 16.8 cents per one million British Thermal Units (MMBTU) whereas the GPPA imputed a roughly 51 cent per MMBTU charge). Defendant argues that the contracts do not apply because they do not reflect the "same or similar circumstances" of the GPPA. That is a merit question not to be addressed at this stage. Because Plaintiffs do not need evidence of other sales to demonstrate a breach of the reasonably prudent operator standard, the Court does not need to weigh in on whether the third-party contracts stand for the proposition that Plaintiffs advance.

iii. *The Court finds that whether the 17.5% is characterized as a sale or a processing fee does not change the duty to market nor preclude class certification*

Defendant claims that Plaintiffs shift theories throughout the pleadings and briefs—the Court disagrees. Plaintiffs' theory is that Defendant owed the class leases a duty to market, and it breached that duty by failing to procure the best price available. *Seeligson*, 761 Fed. Appx. at 331. Plaintiffs refer to the 17.5% off-the-top as a "processing fee"—because it is not clear what else it might be. Defendant attempts to recouch the 17.5% as a "discounted sale" to reflect the value of the gas at the wellhead. That is just another way of saying the same thing—incorporating processing costs into

the value at the wellhead. *See, e.g., Tana Oil & Gas Corp. v. Cernosek*, 188 S.W.3d 354, 360–61 (Tex. App.—Austin 2006, pet. denied) ("In exchange for its sale of 100% of the total volume of raw gas at the well, *Tana* received a price equivalent to 84% of the proceeds for the processed gas. . . this pricing formula represents the negotiated value of the raw gas."); *see also Shoop v. Devon Energy Prod. Co., L.P.*, 2013 WL 12251353, at *13 (N.D. Tex. Mar. 28, 2013) (Solis, J.) (finding the *Tana* transaction "similar" to the transaction between DEPCO and DGS). Whether the 17.5% is characterized as a discounted sale at the wellhead or the application of processing costs, DEPCO still owes a duty to class members to achieve the best price reasonably available for the gas. Either way, operators are bound to behave in a reasonably prudent manner by getting the lowest processing fee (and highest price) reasonably available. Period. Whether or not Defendant did achieve that price is a merits question "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350.

If the 17.5% discounted rate is neither the difference between the product at the wellhead and the value of processed gas nor a 17.5% processing fee then Defendant would not have a legitimate business purpose for the discounted rate. Though this lack of legitimate business purpose seems to be endorsed by Defendant's own pleadings. *See* DEPCO's Amended Answer to Plaintiffs' First Amended Class Action Complaint, and Counterclaim, Subject to Motion to Transfer Venue at 14 (explaining that DEPCO can deduct actual costs on top of the 17.5% rate outlined in the GPPA). According to those

pleadings, DEPCO has not applied the processing costs despite the application of the 17.5% discount. So if the 17.5% is not a processing fee, then the pleadings show DEPCO charged Plaintiffs 17.5% for. . .what? A real charge for a phantom reason.

Because the Gas Purchasing and Processing Agreement is a long-term contract, Defendant argues that recognizing Plaintiff's theory of liability would impose a "duty to renegotiate" and cites *Occidental Permian Ltd. v. Helen Jones Found.,* 333 S.W.3d 392, 397–98 (Tex. App.—Amarillo 2011, pet. denied), as barring this outcome as a matter of law. The dispute in *Helen Jones* arose in 2010 when royalty owners disagreed over the treatment of casinghead gas royalties under leases signed in the 1930s and 1940s. *Helen Jones Found.*, 333 S.W.3d at 397–98. While the leases had been signed in arms-length, good faith negotiations, the leases and processing plants had since been acquired by the same company which resulted in an affiliate situation similar to the one at bar. *Id*. at 397. The Plaintiffs in *Helen Jones* argued that the affiliate nature of the leaseholder and processor allowed the opportunity to renegotiate to accommodate the new market conditions (secondary and tertiary recovery from $CO_2$ injections). *Id*. at 403 ("Under the royalty owners' theory, [Defendant] breached its duty to reasonably market by failing to modify the terms of the gas sales contracts precisely because it, acting alone, has the ability to do so."). The Appeals Court rejected this theory on the grounds that a reasonably prudent operator would not have a duty to modify a gas contract negotiated at arms-length. *Id*. The Appeals Court emphasized that the parties did not set up the offending gas marketing arrangements but "simply acquir[ed] both

sides of arrangements that were prudent when established." *Id*. at 402. Here, DGS and DEPCO set up this gas affiliate marketing arrangement, the prudence of which is now being challenged. A trial on the merits regarding this affiliate transaction will be ferreted out by the finder of facts.

The Court is not imposing a "duty to renegotiate" when it finds that Plaintiffs could demonstrate that the arrangement violates the reasonably prudent operator standard. Defendant argues that "as a matter of law [] a producer does not have a duty to renegotiate gas purchase agreements with its affiliate." Def. Resp. to Pl. Supp. M'tn for Class Cert., Doc. No. 208, at 12. Defendant claims that, were the Court to recognize that Plaintiffs have an actionable theory regarding the prudence of the GPPA, then the Court would be imposing a duty to renegotiate. This is not so. The choices of DEPCO if found to have breached their duty to market is the same as any breaching party to a lawsuit.

    iv.     *The bifurcated royalty, by its plain text, does not trigger "market value" royalties*

Defendant's argument that the bifurcated royalty precludes certification fails under *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 242 (Tex. 1981), as applied to a plain reading of the text. Defendant claims that if the Court recognized a processing theory of liability then the gas would be sold "off the premises" as a matter of law. Because gas sold off the premises triggers a market value royalty obligation, recognizing such theory would therefore preclude class certification. *Hankins*, 111 S.W.3d at 74. In *Middleton*, the lease distinguished between gas "sold or used off the premises" and gas

"sold at the wells" and provided two standards for computing royalties, market value and amount realized (proceeds). 613 S.W.2d at 242. The natural gas in question was produced on the lease but processed at a gas plant in the same field but off the lease grounds. *Id*. The question was whether a sale in the field, but not on the premises of the lease, is a sale "off the premises" or a sale "at the wells." *Id*. The Texas Supreme Court conducted a plain language analysis and concluded that "sold at the wells" means sold at the wells within the lease, and not merely sold within the fields. *Id*. at 243.

Defendant's theory fails under the legal test articulated in *Middleton* because, under the GPPA, gas is sold at the wellhead which, under the plain language of the leases, triggers proceeds royalty obligations. In *Middleton*, when determining which royalty provision applied, the Texas Supreme Court asked, "where did the sale occur?" and then relied on the plain text of the lease to guide the rest of the inquiry. *Id*. at 242. There, it was undisputed that the gas was sold *after* being processed. *Id*. The processing plant was located in the same field which created the dispute as to whether a sale at the plant created a sale "at the well." *Id*. Because the analysis turns on where the gas is sold, where DGS processes the gas is irrelevant because the parties have consistently asserted that the gas is sold at the wellhead. *See* DEPCO's Amended Answer to Plaintiffs' First Amended Class Action Complaint, and Counterclaim, Subject to Motion to Transfer Venue at 14 ("DEPCO sells production from the wells on Plaintiffs' 1988 Leases to DGS at the well and the point of delivery from DEPCO to DGS is likewise at the well."); *see also* Transcript of Hearing on Motion to Reconsider Order

Denying Class Certification and Motion for Class for Class Certification at 72 (DEPCO counsel states that "DEPCO, the producer. . .sells the gas to an affiliated buyer, DGS. . .at the wellhead.")[hereinafter *DEPCO Pretrial Material*].

Defendant's position that applying a processing cost creates an off-the-premises sale, and therefore market value royalty obligation, as a matter of law is directly contradicted by the plain language of the lease used by Defendant. An oil and gas lease is a contract, and its terms are interpreted as such. *See Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 554 (Tex. 2002). We give the language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions. *Id*. The lease at issue in this case states that royalties to be paid by Lessee are:

> (b) on gas. . .produced from said land and sold or used off the premises. . .the market value at the well of one-eighth of the gas so sold or used. . .and provided further on gas sold at the wells the royalty shall be one-eighth of the net proceeds received from such sale, *it being understood that Lessor's interest shall bear one-eighth of the cost of all compression, treating, dehydrating, and transporting costs incurred in market the gas so sold at the wells*."

Oil, Gas and Mineral Lease, Doc. No. 219 (emphasis added).

From the plain language alone, the Court derives two glaring issues with Defendant's theory. The first is that "net proceeds" is clearly the measurement when Defendant has asserted throughout the entire litigation that the gas is sold at the wellhead. *See DEPCO Pretrial Material*, *supra* p. 20 (asserting that, under the GPPA, gas is sold at the wellhead). The second is that a sale at the wellhead can still carry costs without being converted into a "market value" measurement. The parties made it painstakingly clear that gas "so sold at the well" will be measured by "net proceeds"

and bear proportionate costs to market. To recognize Defendant's argument would be to vitiate the intent of the parties as expressed through the plain language of the text.

     *v.*     *Plaintiffs' theory of breach does not trigger an "off the premises" sale*

Applying the processing fee does not create an "off the premises" sale as a matter of law. The Texas Supreme Court explained this concept clearly in *Heritage*:

> The purpose in specifying "at the well" is to distinguish between gas sold in the form in which it emerges from the wellhead and gas which thereafter has had value added by transportation or processing. The Fifth Circuit held that royalties under a "market value at the well" clause should compensate only for the value of the gas at the well, before the operator adds value. Accordingly, that court concluded that royalty owners may be charged with all expenses subsequent to production including processing, transportation, removal of sulfur, and other marketing costs where the royalty provision measures value "at the well." This reasoning is persuasive.

*Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 127 (Tex. 1996) (citing *Piney Woods Country Life Sch. v. Shell Oil Co.,* 726 F.2d 225 (5th Cir.1984) (internal citations omitted). The Texas Supreme Court clearly states that applying processing and marketing costs is compatible with a valuation "at the well." *Id*. The use of "market value" as opposed to "proceeds" in *Piney Woods* does not affect the analysis. *See Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 137 (Tex. 1996) (citing *Martin v. Glass*, 571 F. Supp. 1406, 1411–15 (N.D. Tex. 1983), *aff'd*, 736 F.2d 1524 (5th Cir. 1984)) ("Net proceeds" expressly contemplates deductions, and. . ."at the well" means before value is added by preparing the gas for market.); *see also* Byron C. Keeling, *In the New Era of Oil and Gas Royalty Accounting: Drafting A Royalty Clause That Actually Says What the Parties Intend It to Mean*, 69 Baylor L. Rev. 516, 524 (2017) (explaining the distinction

between the "yardstick" of how royalties will be determined and the "location of the yardstick" which determines the point at which lessee will calculate the royalties). In *Judice*, the Texas Supreme Court explicitly recognized that value can be measured "at the well" while still including deductions so long as the proceeds are "net" and not "gross." 939 S.W.2d at 136–37. *Heritage*, *Piney Woods*, and *Judice* are all seminal cases that directly negate Defendant's assertion that incorporating a processing fee into the valuation means the gas cannot be sold "at the well." Many of Defendant's theories and arguments turn on this point. The Court is unpersuaded.

The District Court in the *Shoop* case, which included virtually identical allegations against DEPCO and DGS by a separate plaintiff class, similarly concluded that the gas was sold at the wellhead even when the processing fee was applied. There, the Plaintiffs argued that the sale between DEPCO and DGS did not occur at the wellhead in an attempt to base the proceeds on a higher downstream value. *Shoop v. Devon Energy Prod. Co., L.P.*, 2013 WL 12251353, at *13 (N.D. Tex. Mar. 28, 2013) (Solis, J.). While Plaintiffs in the current case proceed under a different theory, the analysis applies to Defendant's contention that characterizing the 17.5% discount as a "processing fee" triggers "market value" measurement as a matter of law. In rejecting that notion, the District Court in *Shoop* aptly stated that "royalty calculations based on downstream activities [do] not automatically uproot contractual language dictating where the gas is sold when Texas law is outcome determinative." *Id*.

The Plaintiffs in *Shoop* argued that "since the sales price is not calculated until after the gas is processed and transported to the Bridgeport plant, the sale cannot occur at the well." *Id*. The District Court similarly found cases like *Tana* to be "in diametric opposition" to that argument (again, the same argument adopted by Defendant in the present case). *Id*. The District Court characterized the *Tana* exchange as follows: "In exchange for that sale, Defendant receives a price equivalent for a certain percentage of the processed gas proceeds. Plaintiffs derive their royalty payments from this percentage." *Id*. Concluding that "Under similar facts, [DEPCO] sells the raw gas to DGS at the well" and "even though the price is not established until after the gas is transported and processed, the sale still occurs at the well." *Id*. Because the gas is sold at the wellhead, the measurement of royalties under the plain language of the lease is "net proceeds." Defendant's arguments to the contrary conflate the relationship between the measurement (proceeds versus market value) and the location (at the wellhead versus off the premises).

Finally, advancing a "sham" sale theory does not preclude "at the well" valuation. A sham sale is a phony sale, essentially a charge without purpose; imposed with the intent to defraud. *See Sham*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2003) (defining Sham as "a trick that deludes," also known as a hoax). In spirit with Defendant's running theme that any and every potential theory of liability triggers "market value" royalty, Defendant claims (without authority) that a sham sale triggers "market value" royalty obligations. This is because the sham sale allegedly means the

gas is being sold off the lease. The Court sees no reason, and Defendant offers no authority, why sham sales cannot occur at the wellhead. The parties have maintained that the gas is sold at the wellhead. Sham or not, the plain language of the lease controls.

    *vi.*      *The Court finds that Plaintiffs can demonstrate breach on a classwide basis*

The Court finds that the proceeds nature of the leases, the "uniform pricing gimmick" employed by DGS, and the fact that every class lease was filtered through the Bridgeport system allows the question of breach to be determined in "one single stroke." The principal requirement of *Wal–Mart* is merely a single common contention that enables the class action "to generate common *answers* apt to drive the resolution of the litigation." *Deepwater Horizon*, 739 F.3d at 811. The answer being sought here is whether Defendant breached the duty to market, owed to every member of the class, by employing a 17.5% processing fee (or discount rate). Because the gas is aggregated and fees applied to the aggregate, the answer will be yes or no for every underlying member. In *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 626–27 (5th Cir. 1999), "the Fifth Circuit found that common issues did predominate when casino employees became ill because of a malfunctioning ventilation system, because the employees suffered the same injury, were exposed to the same alleged source of the illness, were subject to the same federal law, and presented a common theory of liability." *Frey v. First Nat. Bank Sw.*, 602 F. App'x 164, 172 (5th Cir. 2015) (citing *Mullen*, 186 F.3d at 626–27). Here, all class members were subject to the same

(allegedly improper) rate, subject to the same duty to market, and presented a common theory of liability. Whether the 17.5% is labeled as a discounted sale or processing fee does not change the duty owed to each class member. Because each class member experienced the same injury from the same pricing mechanism, the Court finds that breach can be determined on classwide basis.

B. Damages can be determined on a classwide basis

The second issue on remand is "whether damages can be ascertained on a classwide basis." *Seeligson*, 761 F. App'x 329, 337. "The legal requirement that class members have all "suffered the same injury" can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse." *Deepwater Horizon*, 739 F.3d at 810–11. The theory of damages "must be consistent with [the] liability case," and the district court is required to "conduct a rigorous analysis [at the class certification stage] to determine whether that is so." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 686 (5th Cir. 2015) (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433). "[The] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Ludlow*, 800 F.3d 674, 686. Plaintiffs' theory is that Defendant breached the duty to market by not receiving the price a reasonably prudent operator would have received. The damages would accordingly be the difference between the rate a reasonably prudent operator would have received and the rate employed by DEPCO, which is then multiplied by the fractional royalty interest. And that is the "straight

forward mathematical exercise" proposed by Plaintiffs. The only variable, if a jury were to find Defendant liable, would be the rate a reasonably prudent operator would have received. The remaining question is whether that rate can be determined classwide or whether a well-by-well analysis is required.

Because the fee applied across-the-board and a Plaintiff is not required to demonstrate evidence of other sales to show an operator has violated the duty to market, the Court finds that the reasonably prudent operator rate can be determined on a classwide basis through generalized, classwide proof. The Court's analysis is like the preceding discussion of breach. "The implied covenant to reasonably market. . .focuses on the behavior of the lessee rather than on evidence of other sales, and asks whether the lessee acted as a reasonably prudent operator under the same or similar facts and circumstances." *Hankins*, 111 S.W.3d 69, 71 (citing *Amoco Prod. Co.*, 622 S.W.2d at 567–68). On an individual level, a Plaintiff would put on evidence of what a reasonably prudent operator would have received for the gas. When the pricing mechanism is applied across the board, as here, then the same damages calculation can be performed for every member. Defendant argues that the alternative rate cannot possibly be deduced because it would be inappropriate to treat the gas as an aggregated entity. Because Plaintiffs are not required to provide evidence of other sales, the Court finds no reason that prevents a jury from being presented alternative rates for the class as a whole. Defendant did not make individual determinations when applying the 17.5% and cannot now claim such practice as a necessity.

The proposed damages model covers only those damages arising from Plaintiffs' theory of breach. "The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast Corp.*, 133 S. Ct. at 1435. Once the Court has found that the alternative rate is susceptible to class resolution, adjudicating breach and damages is relatively simple. If the theory was applied to one plaintiff and one defendant, the damages would be the difference between the price a reasonably prudent operator would have received and actual price received, multiplied over the volume of sales and divided according to respective royalty interests. Plaintiffs' proposed formula merely inputs the payment data, readily receivable from the TIPS accounting software and public data and calculates the damage amount for each class member. The damages would be the sum of all the class members damages combined. Because the Court finds that Plaintiffs are not precluded as a matter of law from determining breach and damages on a classwide basis, it now turns to whether the specific evidence provided by Plaintiffs supports a damages determination classwide.

The Court finds that Plaintiffs have provided sufficient evidence to calculate class damages. Plaintiffs, relying on their expert Jane Kidd, assert that "alternative processing fees attainable by DEPCO can and will be evaluated on a classwide basis through the use of a computer model that relies only on the TIPS and pay history data in the possession of DEPCO." The TIPS data is the internal accounting system that tracks the essential data that would show the amount produced and how much it was

sold for. Transcript of Hearing on Motion to Reconsider Order Denying Class Certification and Motion for Class for Class Certification at 29. The royalty data would show the percentage of damages to each leaseholder. The only remaining data point would be the rate a reasonably prudent operator would have received, which is a merits question. Plaintiffs assert, and the Court agrees, that this would be a "straightforward mathematical exercise."

Because the reasonably prudent operator rate is determinable classwide, and the remaining data needed to calculate damages is readily attainable, the Court finds that damages can be determined on a classwide basis.

### C. Statute of limitations and discovery rule inquiry do not predominate the common question

In order to satisfy Rule 23(b), the court must determine whether "the questions of law or fact common to class members predominate over any questions affecting only individual members." *Seeligson*, 761 F. App'x at 338 (citing FED. R. CIV. P. 23(b)(3)). This "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Id*. The question before the Court is "whether the applicable statute of limitations and potential tolling questions would raise individual issues" that would predominate over common questions such as breach and damages. *See id*. The proposed class contains leases held by DEPCO and processed through BPS between

January 1, 2008 and February 28, 2014. In Texas, there is a four-year statute of limitation for breach of implied covenants. *See HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 885 (Tex. 1998) ("Absent application of the discovery rule, a four-year statute of limitations would bar the claims for breach of implied contractual covenants."). Breach of contract (for the express covenants) are also subject to a four-year statute of limitations. Tex. Civ. Prac. & Rem. Code 16.004, 1.051. Because suit was filed on October 24, 2014, all claims as of October 24, 2010 are timely. The question remains whether the January 1, 2008 to October 23, 2010 claims are barred from class certification due to the statute of limitations and tolling inquiry. Because Texas employs a "categorical" approach to the discovery rule, individual issues do not predominate. Because individual issues do not predominate, the 2008-10 leases are included in the class certification.

Texas employs a categorical approach to the discovery rule. The discovery rule is a "limited exception" to the general rule that a cause of action accrues when a legal injury is incurred. *Archer v. Tregellas*, 566 S.W.3d 281, 290 (Tex. 2018). The discovery rule applies when the nature of the injury is inherently undiscoverable and the evidence of injury is objectively verifiable. *Id*. An injury is inherently undiscoverable when it is "unlikely to be discovered within the prescribed limitations period despite due diligence." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313–14 (Tex. 2006) (quoting *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734–35 (Tex. 2001)). The determination of whether an injury is inherently undiscoverable is made on a

categorical basis rather than on the facts of the individual case. *HECI Expl. Co.*, 982 S.W.2d at 886. We look not to whether particular lessors could have discovered their injury with diligence, but whether the injury incurred by the lessors was "the type of injury that could be discovered through the exercise of reasonable diligence." *Cf. Archer*, 566 S.W.3d at 290 (citing *BP Am. Prod. Co.*, 342 S.W.3d at 66). The next question is whether Plaintiffs would be capable of providing evidence to establish the application of the discovery rule on a classwide basis.

Whether or not the 17.5% fee was "inherently undiscoverable" is a merits question capable of classwide resolution. Whether the injury to the 2008–2010 leases was inherently undiscoverable must be demonstrable by evidence "applicable to the class as a whole" and be "subject to generalized proof." *Nichols,* 675 F.2d at 676. Common evidence will include the way Defendant shared royalty payment information (pay stubs, standard contracts) and whether the terms of the GPPA were available to the lessors. Even though only a specific portion of the class will need the discovery rule, the evidence establishing whether the injury was inherently undiscoverable will be the same across the board. Defendant cites *Wagner & Brown, Ltd.*, 58 S.W.3d at 733, for the proposition that, "In the case of claims for underpaid royalties from breach of oil and gas leases, the Texas Supreme Court has declared categorically that the discovery rule does not apply." Defendant Response to Sup Mt'n at 16.

Defendant reads *Wagner* too broadly and, in either case, it is readily distinguishable from the case at bar. The issue presented in *Wagner* was "whether the

discovery rule applies to oil and gas royalty owners' claims that the lease operator deducted improper gas gathering and compression charges from the gas purchase price." *Wagner & Brown, Ltd.*, 58 S.W.3d at 733. The case followed *HECI*, where the Supreme Court of Texas rejected the application of the Discovery rule to a reservoir damage claim because the appearance of wells on neighboring properties should have alerted Plaintiffs that damage to the reservoir was possible. *HECI Expl. Co.*, 982 S.W.2d at 886. The plaintiffs in *HECI* accordingly had a duty to exercise diligence by inquiring with the lessee. *Id*. In *Wagner*, the charges that were being challenged were consistently listed on the royalty statements. *Wagner & Brown, Ltd.*, 58 S.W.3d at 733. The Court reiterated that "a royalty owner should exercise due diligence to determine whether charges made against royalty payments are proper and reasonable." *Id*. at 736. Because the lessors were aware that a compression charge was being applied, they had a duty to inquire if they suspected unfair practices. *Id*. If the lessees concealed the information then that would give rise to fraudulent concealment, a different proceeding entirely. *Id*. In this case, the GPPA was a private agreement between DGS and DEPCO that was not publicly available. More importantly, the 17.5% charge was not listed on the royalty statements provided by DEPCO. Nor does DEPCO claim that its handling of business records differed between its lessors. Because the lessors had similar dealings and interactions with DEPCO, the Court finds that the discovery rule inquiry will be categorical and susceptible to "generalized, classwide proof."

The fact that one of the named Plaintiffs allegedly was told about the 17.5% during a phone call does not negate the discovery inquiry. The discovery rule asks about the injury from an objective, not subjective, point of view. *See HECI Expl. Co.*, 982 S.W.2d at 886. DEPCO can put forth that evidence in favor of its argument regarding discoverability, but that again is a merits question and not for this stage of the proceedings. Because Texas employs a categorical approach to the discovery rule, statute of limitation and discovery rule inquiries do not predominate over common questions.

D. Plaintiffs have satisfied the necessary elements under Rule 23.

The Court finds that Plaintiffs have carried the burden in showing that Class Certification is proper. Between the Court's first opinion and the Fifth Circuit's review, the issues regarding numerosity, superiority, typicality, and representativeness were satisfied. On remand, the Court finds that breach and damages are susceptible to classwide proof. Because Defendant applied the same pricing mechanism to every member without regard to individual well characteristics, the Court finds that breach can be decided on a classwide basis. Because Plaintiffs have identified a formula that would adequately measure the alleged breach, the Court finds that damages are similarly susceptible to classwide resolution. Because Texas employs a categorical approach to the discovery rule, the Court finds that statute of limitations and discovery inquiries do not predominate over the common question. Because Plaintiffs have

satisfied the elements necessary for class certification under Rule 23, the Court

**GRANTS** the Supplemental Motion for Class Certification.

  **SO ORDERED.**

  Signed February 11th, 2020.

             *Ed Kinkeade*
             ED KINKEADE
             UNITED STATES DISTRICT JUDGE